N59sOCOp

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                          21 CR 536 (JSR)
                                    23 CR 113 (JSR)

JOSEPH JAMES O'CONNOR,

                Defendant.

------------------------------x

                                New York, N.Y.
                                May 9, 2023
                                11:30 a.m.


Before:

                      HON. JED S. RAKOFF,

                                  District Judge


                      APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  OLGA ZVEROVICH
     Assistant United States Attorney

DECHERT LLP
     Attorney for Defendant
BY:  JEFFREY A. BROWN

N59sOCOp

1          (Case called)

2          MS. ZVEROVICH:  Good morning, your Honor.

3          Olga Zverovich for the United States.

4          THE COURT:  Good morning.

5          MR. BROWN:  Good morning, your Honor.  Jeffrey Brown

6     from Dechert joined by Nicholas Gersh.

7          THE DEPUTY CLERK:  Can you spell Nicholas' last name?

8          MR. GERSH:  G-e-r-s-h.

9          THE DEPUTY CLERK:  Thank you.

10          THE COURT:  So we're here for an entry of a guilty

11    plea in two matters 21 CR 536, filed in the Southern District

12    of New York, and my understanding is that the defendant wants

13    to plead guilty to Counts One, Two, and Four of that

14    indictment.

15          And then there is also an information 23 CR 113

16    initially filed in the Northern District of California and

17    transferred here, consolidated with the other case, and my

18    understanding is the defendant wishes to plead guilty to Counts

19    One through Seven of that information.

20          The one thing I was not clear about is, had the

21    defendant already waived indictment and agreed to the filing of

22    the information?

23          I see, no.  He's going to do that here this morning.

24    Very good.

25          MS. ZVEROVICH:  That's correct, your Honor.

N59sOCOp

1          He was in extradition custody, so he never appeared in

2     the Northern District of California, so the plan was to do it

3     before your Honor.

4          THE COURT:  All right.

5          MS. ZVEROVICH:  Your Honor, if I may just put one

6     other matter on the record, which is that after the court

7     rescheduled the guilty plea to take place today, which I think

8     the court issued that scheduling order last Friday, the

9     California prosecutors sent out victim notifications to let the

10    victims know of the plea date.

11         My understanding is that some of those notifications

12    were sent by snail mail, because only mailing addresses were

13    available for those victims, so it's possible that some of the

14    victims may not have received the snail mail by today's

15    proceeding.

16         I've discussed it with those prosecutors.  The

17    government is fine proceeding under the circumstances, but we

18    just wanted to put that on the record at the plea.

19         THE COURT:  All right.  Of course any victim has the

20    right to appear in connection with sentencing, and that's

21    really where it's more relevant to hear from them in any event,

22    so I don't see any problem.

23         I hope your colleagues in the Northern District of

24    California have more faith in the assiduousness of the U.S.

25    Postal Service than apparently they do.

N59sOCOp

1            All right.  So let's place the defendant under oath.

2            THE DEPUTY CLERK:  Please rise and raise your right

3    hand.

4            (Defendant sworn)

5            THE COURT:  OK.  Mr. O'Connor, first let me advise you

6    that because you're under oath, anything you say that is

7    knowingly false could subject you to punishment for perjury,

8    obstruction of justice, or the making of false statements.

9            Do you understand that?

10           THE DEFENDANT:  I do.

11           THE COURT:  I'm going to ask you a bunch of questions.

12   Some of them will relate to both of these charging instruments

13   and some, I'll indicate where, only will relate to the

14   California one.  But let's proceed with the common questions.

15           Do you read, write, and speak and understand English?

16           THE DEFENDANT:  Yes.

17           THE COURT:  How far did you go in school?

18           THE DEFENDANT:  High school.

19           THE COURT:  How old are you now?

20           THE DEFENDANT:  23.

21           THE COURT:  Have you ever been treated by a

22   psychiatrist or a psychologist?

23           THE DEFENDANT:  As a child.

24           THE COURT:  OK.  Without getting into details, what

25   generally was that about?

N59sOCOp

1              THE DEFENDANT:  Um, just, like, for ADHD.

2              THE COURT:  Were you ever hospitalized for any mental

3     illness?

4              THE DEFENDANT:  No.

5              THE COURT:  Have you ever been treated or hospitalized

6     for alcoholism?

7              THE DEFENDANT:  No.

8              THE COURT:  Have you ever been treated or hospitalized

9     for drug addiction?

10             THE DEFENDANT:  No.

11             THE COURT:  I'm sorry.  You need to speak into the

12    microphone.

13             THE DEFENDANT:  No, never.

14             THE COURT:  Are you currently under the care of a

15    physician for any reason?

16             THE DEFENDANT:  I'm sorry.  I didn't hear you.

17             THE COURT:  Yes.  Are you currently under the care of

18    a physician, a doctor, for any reason?

19             THE DEFENDANT:  No.

20             THE COURT:  Last 24 hours, have you taken any pill or

21    medicine of any kind?

22             THE DEFENDANT:  No.

23             THE COURT:  Last 24 hours, have you taken any alcohol

24    or any narcotic?

25             THE DEFENDANT:  No.

N59sOCOp

1          THE COURT:  Is your mind clear today?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Do you understand these proceedings?

4          THE DEFENDANT:  Yes.

5          THE COURT:  On the basis of the defendant's responses

6     to my questions and my observations of his demeanor, I find he

7     is fully competent to enter an informed plea and an informed

8     waiver at this time.

9          Now, Mr. O'Connor, you have a right to be represented

10    by counsel at every stage of these proceedings.

11         Do you understand that?

12         THE DEFENDANT:  Yes.

13         THE COURT:  And at any time you can't afford counsel,

14    the court will appoint one for you free of charge to represent

15    you free of charge throughout the proceedings.

16         Do you understand that?

17         THE DEFENDANT:  Yes.

18         THE COURT:  Mr. Burlingame, are you appointed or

19    retained?

20         MR. BROWN:  I'm Mr. Brown.

21         THE COURT:  I'm sorry.

22         MR. BROWN:  No, it's not.  I'm standing in for him.

23    He's back in London.  We are retained.

24         THE COURT:  OK.  So, Mr. O'Connor, have you had a full

25    opportunity to discuss these matters with your counsel?

N59sOCOp

```
1              THE DEFENDANT:  Yes.

2              THE COURT:  And have you told them everything you know

3    about these matters?

4              THE DEFENDANT:  Yes.

5              THE COURT:  And are you satisfied with their

6    representation?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Now, with respect to the charges initially

9    brought in California, the government proposes to file against

10   you in this district an information entitled *United States of*

11   *America v. Joseph James O'Connor,* with a California number

12   CR 23-113 (RS).

13             Have you gone over that information with your lawyers?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Have you read it yourself?

16             THE DEFENDANT:  Yes.

17             THE COURT:  Do you understand the charges in that

18   information that are being filed against you?

19             THE DEFENDANT:  Yes.

20             THE COURT:  Let me ask defense counsel, do you want

21   that information read again here in open court, or do you waive

22   the public reading?

23             MR. BROWN:  We waive the reading, your Honor.

24             THE COURT:  So, Mr. O'Connor, you have a

25   constitutional right to have those charges, the California
```

N59sOCOp

1    charges, presented to a grand jury which is a group of 16 to

2    23 people who would hear evidence and could only file those

3    charges against you if they determined there was probable cause

4    to believe you had committed those crimes.

5                Do you understand that right?

6                THE DEFENDANT:  Yes.

7                THE COURT:  My understanding is that you're prepared

8    to give up or waive that right and to allow the government to

9    file that information against you without going to the grand

10   jury.

11               Is that right?

12               THE DEFENDANT:  Yes.

13               THE COURT:  In that regard I've received a signed

14   waiver of indictment and it appears that both you and your

15   counsel signed it.  I see your signatures.  I don't see the

16   date.

17               Was that signed today?

18               THE DEFENDANT:  Yes.

19               THE COURT:  OK.  So I will insert that date.  I will

20   give that to my courtroom deputy to witness, and we will accept

21   for filing the aforementioned information.

22               Now, even though that information has now been filed,

23   you can still go to trial on those charges.  But I understand

24   you wish to plead guilty to those charges as well as to certain

25   of the charges in the Southern District indictment.

N59sOCOp

1          Is that right?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Very good.

4          Before I can accept any plea of guilty, I need to make

5   certain that you understand the rights you will be giving up if

6   you plead guilty, so I want to go over with you now the rights

7   you will are giving up.

8          Do you understand that?

9          THE DEFENDANT:  Yes.

10          THE COURT:  First, you have a right to a speedy and a

11   public trial by a jury on each and all of the charges against

12   you.

13          Do you understand that?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Second, if there were a trial, you would

16   be presumed innocent.  The government would be required to

17   prove your guilt beyond a reasonable doubt before you could be

18   convicted of any charge.

19          Do you understand that?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Third, at the trial you would have the

22   right to be represented by counsel and, once again, if at any

23   time you could not afford counsel, the court would appoint one

24   for you free of charge to represent you at the trial and

25   through all other proceedings.

N59sOCOp

```
 1              Do you understand that?
 2              THE DEFENDANT:  Yes.
 3              THE COURT:  Fourth, at the trial you would have the
 4    right to see and hear all the witnesses and other evidence
 5    against you and your attorney could cross-examine the
 6    government's witnesses, object to the government's evidence,
 7    and could offer evidence on your own behalf, if you so desired,
 8    and could have subpoenas issued to compel the attendance of
 9    witnesses and other evidence on your behalf.
10              Do you know all that?
11              THE DEFENDANT:  Yes, I do.
12              THE COURT:  Fifth, at the trial you would have the
13    right to testify if you wanted to, but no one could force you
14    to testify if you did not want to, and no suggestion of guilt
15    could be drawn against you simply because you chose not to
16    testify.
17              Do you understand that?
18              THE DEFENDANT:  Yes.
19              THE COURT:  Sixth, even if you were convicted of one
20    or more charges, you would have the right to appeal your
21    conviction.
22              Do you understand that?
23              THE DEFENDANT:  Yes.
24              THE COURT:  Now, do you understand that if you plead
25    guilty, you will be giving up each and every one of the rights
```

N59sOCOp

1    we just discussed?

2              Do you understand that?

3              THE DEFENDANT:  Yes.

4              THE COURT:  Very good.

5              Now, the maximum punishment that you face if you plead

6    guilty to Counts One through Seven of the California

7    information, and One, Two, and Four of the indictment --

8              by the way, I forgot to ask defense counsel.  Do you

9    want the indictment read here again in open court, or do you

10   waive the public reading?

11             MR. BROWN:  I waive, your Honor.

12             THE COURT:  Mr. O'Connor, you've read the indictment;

13   yes?

14             THE DEFENDANT:  Yes.

15             THE COURT:  You've discussed it with your counsel;

16   yes?

17             THE DEFENDANT:  Yes.

18             THE COURT:  You understand the charges in the

19   indictment against you; yes?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Very good.

22             So the maximum punishment you face if you plead guilty

23   to all those counts that I just mentioned is as follows:

24             Count One of the Southern District charge carries a

25   maximum term of imprisonment of five years, to be followed by

N59sOCOp

1    up to three years' supervised release to follow any

2    imprisonment, plus a fine of whichever is greatest, either

3    $250,000 or twice the amount of money derived from the crime,

4    or twice the loss to persons who are victims of the crime, plus

5    a mandatory $100 special assessment.

6         Do you understand those are the maximum punishments on

7    Count One?

8         THE DEFENDANT:  Yes.

9         THE COURT:  That, by the way, is the count that

10   charges you with conspiracy, in other words, an agreement

11   between you and at least one other person to commit computer

12   intrusions.

13        Now, Count Two charges you with conspiracy to commit

14   wire fraud, and that count carries a term, maximum term of

15   20 years in prison, plus up to three years' supervised release

16   to follow any imprisonment, plus a fine, whichever is greatest,

17   either $250,000 or twice the gross loss or twice the gross

18   gain, plus a $100 mandatory special assessment.

19        Do you understand those are the maximum punishments

20   under Count Two of the Southern District indictment?

21        THE DEFENDANT:  Yes.

22        THE COURT:  And Count Four of the Southern District

23   indictment which charges you with conspiracy to commit money

24   laundering carries a maximum term of 20 years' imprisonment,

25   plus up to three years' supervised release to follow any

N59sOCOp

1  imprisonment, plus a fine, whichever is greatest, either

2  $500,000 or twice the gross gain or twice the gross loss -- I'm

3  sorry, it's a little bit different from money laundering.

4          The possible maximum fine is either $500,000 or twice

5  the value of the monetary instrument or funds involved in the

6  offense, plus a $100 mandatory special assessment.

7          Do you understand those are the maximum punishments

8  under Count Four of the Southern District indictment?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Now, Count One of the California

11  information has a maximum term of five years, plus up to

12  three years of supervised release to follow any imprisonment,

13  plus a fine of, whichever is greatest, either $250,000, twice

14  the gross gain or twice the gross loss, plus a $100 mandatory

15  special assessment.

16          Do you understand those are the maximum under Count

17  One of the California charge?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Count Two of the California information --

20          I'm sorry.  By the way, Count One of the California

21  information also charges you with conspiracy to commit computer

22  intrusion.

23          Do you understand that?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Count Two of the California information

1   charges you with committing the substantive crime of computer

2   intrusion and carries a maximum term of five years'

3   imprisonment, plus up to three years' supervised release to

4   follow any imprisonment, plus a fine of, whichever is greatest,

5   either $250,000 or twice the gross fine or twice the gross

6   loss, plus a mandatory $100 special assessment.

7            Do you understand those are the maximum punishments

8   under Count Two of the California information?

9            THE DEFENDANT:  Yes.

10           THE COURT:  Count Three of the California information

11  charges you with committing computer intrusion with intent to

12  extort, and that carries a maximum five years' imprisonment,

13  plus up to three years' supervised release to follow any

14  imprisonment, plus a fine of, whichever is greatest, either

15  $250,000 or twice the gross gain or twice the gross loss, plus

16  a mandatory $100 special assessment.

17           Do you understand those are the maximum punishments

18  under Count Three?

19           THE DEFENDANT:  Yes.

20           THE COURT:  Count Four of the California information

21  charges you with making executory communications and carries a

22  maximum term of two years' imprisonment, plus one year of

23  supervised release to follow any imprisonment, plus a fine,

24  whichever is greatest, either $250,000 or twice the gross gain

25  or twice the gross loss, plus a mandatory $100 special

1    assessment.

2                Do you understand those are the maximum punishments

3    under Count Four of the California information?

4                THE DEFENDANT:  Yes.

5                THE COURT:  Count Five and Seven of the California

6    information each charge you with stalking, in violation of

7    various criminal federal criminal provisions, and each of those

8    carries a maximum term of five years' imprisonment, plus up to

9    three years' supervised release to follow any imprisonment,

10   plus a fine of, whichever is greatest, either $250,000 or twice

11   the gross gain or twice the gross loss, plus a mandatory $100

12   special assessment on each of those charges.

13               Do you understand those are the maximum punishments

14   under both Counts Five and Count Seven of the California

15   information?

16               THE DEFENDANT:  Yes.

17               THE COURT:  Count Six of the California information

18   charges you with making threatening communications and carries

19   a maximum term of up to five years' imprisonment, to be

20   followed by up to three years' supervised release, plus a fine

21   of, whichever is greatest, either $250,000 or twice the gross

22   gain or twice the gross loss, plus a mandatory $100 special

23   assessment.

24               Do you understand those are the maximum punishments

25   under Count Six of the California information?

N59sOCOp

```
 1              THE DEFENDANT:  Yes.

 2              THE COURT:  Now, all of those could be added together

 3     if you plead guilty to all those counts, in which case you

 4     would face up to 77 years of imprisonment.

 5              Do you understand that?

 6              THE DEFENDANT:  Yes.

 7              THE COURT:  Also some or all of those counts require

 8     that I understood restitution of monies taken from the victims.

 9              Do you understand that?

10              THE DEFENDANT:  Yes.

11              THE COURT:  Now, I meant to ask defense counsel, do

12     you agree to waive venue and consent to the prosecutions of the

13     California information here in the Southern District of New

14     York?

15              MR. BROWN:  We do, your Honor.

16              THE COURT:  Very good.

17              Now, in connection -- I mean, I have absolutely no

18     idea what sentence I will impose in this case, but one of the

19     things I'll look at are the sentencing guidelines.  Although I

20     need to tell you, if you don't already know from your counsel,

21     that I pay little or no attention to the guidelines because I

22     think they are inherently irrational, both specifically in your

23     case and generally in all cases.  But I won't bother with my

24     usual two-hour speech as to why they are so completely and

25     totally irrational.
```

N59sOCOp

1          Nevertheless, I'm required to calculate them, and

2    according to you and the government, you agree that the

3    guideline range is 70 to 87 months in prison.

4          Is that right?

5          THE DEFENDANT:  Yes.

6          THE COURT:  And in that regard I've been furnished

7    with a letter agreement, which we will now mark as Court

8    Exhibit 1 to today's proceeding, and takes the form of a letter

9    from the government to defense counsel and appears that you

10   signed it, Mr. O'Connor, earlier today.

11         Is that right?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Before signing it, did you read it?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Did you discuss it with your lawyers?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Did you understand its terms?

18         THE DEFENDANT:  Yes.

19         THE COURT:  And did you sign it in order to indicate

20   your agreement to its terms?

21         THE DEFENDANT:  Yes.

22         THE COURT:  I should also note for the record that on

23   page four, with respect to restitution the parties have placed

24   an amendment that they have initialed that restitution is in

25   the amount of at least $794,012.64.  Let's go through that

N59sOCOp

1    again.  It's $794,012.64, but that's at least.

2                So let me ask counsel for both the government and the

3    defense, you both agree to that change; yes?

4                MS. ZVEROVICH:  Yes, your Honor.

5                MR. BROWN:  Yes, your Honor.

6                THE COURT:  And, Mr. O'Connor, you agreed as well?

7                THE DEFENDANT:  Yes.

8                THE COURT:  All right.  So this letter agreement which

9    we've now marked as Court Exhibit 1 is binding between you and

10   the government, but it is not binding on me.  It is not binding

11   on the court.

12                For example, with respect to the guidelines, I may

13   agree with the guideline calculation, though I probably will

14   pay it no heed, or I may disagree with the guideline

15   calculation.  But if you plead guilty, it doesn't matter what I

16   think about the guideline calculation.  You will still be bound

17   by my sentence.

18                Do you understand that?

19                THE DEFENDANT:  Yes.

20                THE COURT:  More generally, do you understand that if

21   anyone has made any kind of promise or prediction or

22   representation to you of what your sentence will be in this

23   case, that person could be totally wrong.  Nevertheless, if you

24   plead guilty, you will still be bound by my sentence.

25                Do you understand that?

N59sOCOp

1              THE DEFENDANT:  Yes.

2              THE COURT:  On the other hand, if I do sentence you to

3      anything within the guideline range or below it, you have

4      agreed not to appeal or otherwise attack your sentence.

5              Do you understand that?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Does the government represent that this

8      letter agreement that we've now marked as Court Exhibit 1 is

9      the entirety of any and all agreements between the government

10     and Mr. O'Connor?

11             MS. ZVEROVICH:  Yes, your Honor.

12             There was also a consent forfeiture order, which is

13     appended to the agreement, and outside of that there are no

14     other agreements.

15             THE COURT:  Yes, I have that separately and I will get

16     to that in a minute.

17             Does defense counsel agree with all that?

18             MR. BROWN:  We do, your Honor.

19             THE COURT:  Mr. O'Connor, do you agree?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Mr. O'Connor, other than the government,

22     has anyone else made any kind of promise to you or offered you

23     any inducement to get you to plead guilty to this case?

24             THE DEFENDANT:  No.

25             THE COURT:  Has anyone threatened or coerced you in

1    any way to get you to plead guilty in this case?

2                THE DEFENDANT:  No.

3                THE COURT:  Does the government represent that if this

4    case were to go to trial, it could through competent evidence,

5    prove every essential element of each of these many counts

6    beyond a reasonable doubt?

7                MS. ZVEROVICH:  Yes, your Honor.

8                THE COURT:  Does defense counsel know of any valid

9    defense that would likely prevail at trial or any other reason

10   why his client should not plead guilty?

11               MR. BROWN:  No, your Honor.

12               THE COURT:  Very good.

13               So, Mr. O'Connor, tell me now in your own words what

14   it is that you did that makes you guilty of these various

15   counts.

16               MR. BROWN:  Just to orient you, your Honor, with your

17   permission he'll begin with the California instrument, starting

18   with Count One of the Northern District of California

19   information.

20               THE COURT:  That's fine.

21               THE DEFENDANT:  For Count One in July 2020, I became

22   aware that Twitter had been --

23               MR. BROWN:  Slower.

24               THE DEFENDANT:  OK.  Sorry.

25               In July of 2020, I became aware that Twitter had been

1    hacked when a person I knew sent me a screenshot showing

2    Twitter's internal administration controls.  The person who

3    hacked Twitter was selling accounts of difficult-to-obtain

4    public-facing account names, and I messaged him about buying

5    one.  After looking at a number of them, I asked the hacker to

6    confirm that he actually controlled the account name "@6,"

7    which is the one I wanted to buy, by changing the username to

8    "pwj" display name.  Eventually, I decided not to buy it

9    because of the publicity surrounding the hack.

10           Count Two.  In August 2020, I agreed with others to

11   hack into the TikTok account of a US-based social media

12   influencer.  Once we hacked into the account, I changed the

13   account username to include my name and one of the dealers who

14   did the hack with me so we would get more attention to increase

15   our online following.  For the same reason, we also posted

16   videos to the account claiming we had nude photos of the person

17   whose account it was.  We never actually had any nude photos,

18   we hoped it would get us more attention.

19           For Counts Three, Four, and Five.  In June 2019, I

20   agreed with others to improperly access the Snapchat account of

21   a US-based social media influencer.  I again added my name to

22   the account to try and get attention and attract online

23   followers.  When I was looking through the account -- when I

24   was looking through the accessed account, I came across nude

25   photos of the account holder.  I sent the photos to others

1    involved in the hack because I stupidly thought that it was

2    funny.  One of my coconspirators then contacted the account

3    holder and threatened to release nude photos publicly if the

4    account holder did not give us a "shout out" for giving control

5    back to her account.  While I did not engage in the threats to

6    release the photos, it was reasonably foreseeable to me that my

7    actions could have led to this, and without sending the photos

8    to others, she would never have been threatened.

9         For Count Seven.  In late June 2018, I met a person in

10    a Discord chat room that contained thousands of users.  This

11    person and I began a brief online relationship that included

12    one-to-one chats.  She was confident and sexually explicit in

13    our chats, including initiating sexual chats that involved

14    violent fantasies.  She told me at one point that she was 16,

15    but later on said that she was joking and that she was really

16    18.  She requested and in response I sent her a picture of my

17    penis.  After this, in a Discord chat room with many users, I

18    made the joke about her cheating on her boyfriend, and she

19    retaliated by posting the image I had sent her.  Our

20    relationship became very hostile after this, and she threatened

21    to release my real name and address publicly.  I talked to my

22    friends and we decided I should "swat" her to intimidate her.

23    I sent and phoned in threats to authorities and entities near

24    where she lived using scripts that I found online that

25    identified her as the violent threat, hoping that this would

1    cause the police and fire department to come to her house.

2           For Count Six.  In July 2020, the same girl contacted

3    me after I received publicity in connection with the Twitter

4    hack.  She again started engaging in flirtatious chats.  I was

5    still angry and did not want anything to do with her.  I

6    contacted her family members to tell them what she was doing

7    online.  I argued with them and ended up in a verbal argument,

8    in which I'm sure I knowingly made threats, although I do not

9    believe I threatened to kill anyone.  I eventually blocked her

10   from being able to contact me and we never spoke again.

11          This is for the SDNY indictment.  In April of 2019, I

12   agreed with a number of others to steal cryptocurrency from a

13   Manhattan-based cryptocurrency exchange through a SIM-swap

14   attack.  The theft netted just under $800,000 worth of

15   cryptocurrency.  I received a portion of the stolen

16   cryptocurrency, and I agreed with others to conduct a number of

17   transactions with it in order to make it more difficult to

18   trace.

19          THE COURT:  All right.  Is there anything else that

20   the government wishes to have the court inquire about regarding

21   the factual portion of the allocution?

22          MS. ZVEROVICH:  No, your Honor.

23          But the government would just proffer, with respect to

24   Count One of the SDNY indictment, as well as with respect to

25   Counts One and Two of the NDCA information, that the value of

N59sOCOp

1  the information obtained through the unauthorized access in

2  each of those counts exceeded $5,000.

3          THE COURT:  OK.  Is there anything else --

4          Oh, I meant to mention to you, Mr. O'Connor.  When I

5  was telling you the penalties, in addition to prison I

6  mentioned possibility of supervised release.  I want to make

7  sure you understand that if I do impose any term of supervised

8  release and you violate any of the conditions of supervised

9  release, that could subject you to further imprisonment going

10 even beyond the term of supervised release.

11         Do you understand that?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Also, I've been furnished with a consent

14 preliminary order of forfeiture which appears in proper form

15 except that --

16         Let me ask the government.  Back on May 1 of 2023, a

17 few days ago you signed the consent preliminary order of

18 forfeiture; yes?

19         MS. ZVEROVICH:  Yes, your Honor.

20         THE COURT:  Did you read it?

21         MS. ZVEROVICH:  Yes, your Honor.

22         THE COURT:  Well, so let's take a look at it.

23         First, it says in the heading, 21 CR 536 (RMB) meaning

24 Judge Berman.

25         Did you read that?

1          MS. ZVEROVICH:  Yes, your Honor.  It was true as of

2    May 1, and I neglected to change it afterwards.

3          THE COURT:  So let's change that to JSR.

4          Similarly, on the last page of what you gave me to

5    sign today, you identify me as Richard Berman.  Now he's a lot

6    better looking than I am, not to mention smarter, but may I

7    take the liberty of changing that to Jed S. Rakoff?

8          MS. ZVEROVICH:  Yes, your Honor.

9          THE COURT:  Very good.

10         All right.  So I've signed the consent order and I'll

11   give it to my courtroom deputy to docket.  Now is there

12   anything else regarding any aspect of --

13         I'm sorry.  I forgot to ask Mr. O'Connor the most

14   important question, which is:  When you did all those things --

15   and some of them I understand you had some qualifications

16   about -- but nevertheless, when you did all those things, you

17   knew that what you were doing was illegal and wrong; yes?

18         THE DEFENDANT:  Yes.

19         THE COURT:  All right.  Anything else regarding any

20   aspect of the allocution that either counsel wishes the court

21   to inquire about?

22         MS. ZVEROVICH:  Your Honor, just two matters.

23         One is I know the court has covered the appeal waiver,

24   but I believe when the court did that it just referenced

25   guidelines range generally.

N59sOCOp

1          Just to avoid any confusion, I would just ask the

2     court to confirm that the defendant understands that as long as

3     the court imposes any sentence of 87 months or lower, he has

4     waived his right to appeal or to bring a collateral challenge.

5          THE COURT:  Yes.

6          You heard the government.  Do you agree with that?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Very good.

9          MS. ZVEROVICH:  The second matter, your Honor, is if

10    the court would advise the defendant about the possible

11    immigration consequences of his guilty plea given that he is a

12    U.K. citizen.

13         THE COURT:  Yes.  Thank you very much.

14         So there is every likelihood that you will be deported

15    following any imprisonment term I impose.

16         Do you understand that?

17         THE DEFENDANT:  Yes.

18         THE COURT:  All right.  Anything else from the

19    government?

20         MS. ZVEROVICH:  Just, your Honor, just also for the

21    record, the government in advance of the plea sharing the

22    elements of the offense, would defense counsel our

23    understanding there is no dispute as to those elements.

24         If the court would confirm that the defendant does not

25    need them set forth on the record?

N59sOCOp

1          THE COURT:  I think that's a question for defense

2     counsel, so my time is your time.

3          Would you like the elements set forth on the record?

4     It's only 12:15.  We could easily do that by two or three

5     o'clock.

6          MR. BROWN:  No, your Honor, and I agree with the

7     government that they did provide them, their version of the

8     elements to us in advance, and we reviewed them closely and

9     checked them against our client's allocution.

10          We are satisfied.

11          THE COURT:  OK.  Very good.

12          Anything from defense counsel regarding the

13     allocution?

14          MR. BROWN:  Not regarding the allocution, your Honor,

15     no.

16          THE COURT:  All right.  So in light of everything

17     we've now discussed, Mr. O'Connor, how do you now plead first

18     to Count One of the Southern District indictment; guilty or not

19     guilty?

20          THE DEFENDANT:  Guilty.

21          THE COURT:  Count Two of that indictment; guilty or

22     not guilty?

23          THE DEFENDANT:  Guilty.

24          THE COURT:  Count Four of that indictment; guilty or

25     not guilty?

N59sOCOp

```
 1                  THE DEFENDANT:  Guilty.

 2                  THE COURT:  Turning to the information, Count One of

 3      the California information; guilty or not guilty?

 4                  THE DEFENDANT:  Guilty.

 5                  THE COURT:  Count Two of the information; guilty or

 6      not guilty?

 7                  THE DEFENDANT:  Guilty.

 8                  THE COURT:  Count Three of the information; guilty or

 9      not guilty?

10                  THE DEFENDANT:  Guilty.

11                  THE COURT:  Count Four of the information; guilty or

12      not guilty?

13                  THE DEFENDANT:  Guilty.

14                  THE COURT:  Count Five of the information; guilty or

15      not guilty?

16                  THE DEFENDANT:  Guilty.

17                  THE COURT:  Count Six of the information; guilty or

18      not guilty?

19                  THE DEFENDANT:  Guilty.

20                  THE COURT:  And Count Seven of the information; guilty

21      or not guilty?

22                  THE DEFENDANT:  Guilty.

23                  THE COURT:  Because the defendant has acknowledged his

24      guilt as charged, because he has shown that he understands his

25      rights and because his plea is entered knowingly and
```

1  voluntarily and supported by an independent basis in fact

2  containing each of the essential elements of each of the

3  offenses, I accept his plea and adjudge him guilty of Counts

4  One, Two and Four of the Southern District indictment and

5  Counts One through Seven of the California information.

6          Mr. O'Connor, the next stage in this process is that

7  the probation office will prepare what is called a presentence

8  report to assist me in determining sentence.  As part of that,

9  you will be interviewed by the probation officer.  You can have

10 your counsel present at the interview to advise you of your

11 rights, but under my practices, you personally need to answer

12 the questions put to you by the probation officer.

13         Do you understand that?

14         THE DEFENDANT:  Yes.

15         THE COURT:  After that report is in draft form, before

16 it's in final form, your counsel and government counsel have a

17 chance to review it and to offer suggestions, corrections, and

18 additions directly to the probation officer, who will then

19 appropriate the report in file to come to.

20         Me.  Independent of that, counsel for both sides are

21 hereby given leave to submit directly to the court in writing

22 any and all materials bearing on the aspect of sentence,

23 provided those materials are submitted no later than one week

24 before sentence.

25         We will set the sentence down for.

N59sOCOp

| | |
|---|---|
| 1 | THE DEPUTY CLERK:  Wednesday, August 9, at 2:30. |
| 2 | THE COURT:  Yes, sir. |
| 3 | MR. BROWN:  Your Honor, we had discussed an expedited |
| 4 | sentencing in connection with the fact that as you can see, my |
| 5 | client was detained and we presented to you facts. |
| 6 | THE COURT:  I think that makes perfect sense. |
| 7 | MR. BROWN:  Right. |
| 8 | THE COURT:  Let me ask my courtroom deputy.  What's |
| 9 | the quickest probation can normally? |
| 10 | THE DEPUTY CLERK:  I think two months. |
| 11 | THE COURT:  So that would be? |
| 12 | THE DEPUTY CLERK:  July 7. |
| 13 | MR. BROWN:  I know this is a question for probation, |
| 14 | your Honor, but is there any world in which we can do it in |
| 15 | 45 days? |
| 16 | THE COURT:  Let's do this.  Let's put it down for |
| 17 | 45 days.  I will then ask counsel for both sides to jointly |
| 18 | call probation, explain to them that that's my hope and |
| 19 | recommendation, and ask them if they can do it.  If they can't |
| 20 | do it, I'm going to be governed by whatever they say.  I think |
| 21 | they are usually responsive. |
| 22 | Let's set it down for 45 days.  What would that be? |
| 23 | THE DEPUTY CLERK:  Friday, July 23. |
| 24 | THE COURT:  No, no, no. |
| 25 | THE DEPUTY CLERK:  I'm sorry.  That's what I meant. |

N59sOCOp

1    Friday, June 23, at 3:30.

2            THE COURT:  We'll set it down for that.  If the

3    probation officer says they can't do it, but gives you by when

4    they can, then jointly call my chambers and we'll set the new

5    date.  But hopefully they can do it in 45 days.  OK.

6            MR. BROWN:  Thank you, your Honor.

7            THE COURT:  Anything else that anyone wants to take up

8    today?

9            MR. BROWN:  If I may.

10           This is mitigated, I think, in part by the expedited

11   nature of the sentencing.  But I wanted to make you aware of an

12   accident that occurred at the MDC with my client to see if it

13   impacts your calculus on bail.  I'll be brief.

14           When he was released from quarantine and brought to

15   the wing in the general population, he was given access to his

16   commissary.  He bought some items.  He was immediately set upon

17   by some group of five or six people, who took him separately

18   into a place they couldn't be seen and threatened to stab him,

19   took his items, extorted him for some money that I think he

20   arranged to have sent through, you know, telephonic and

21   electronic means.

22           And we had presented to your Honor that, because of

23   his diagnosed condition of autism, he is acutely vulnerable in

24   that environment.  And you had found on the basis of his lack

25   of ties to the community that he presented a flight risk and

1    should be detained.

2              And in light of that event, I'm asking if you might

3    reconsider the question of bail for my client.

4              THE COURT:  What's the government's view?

5              MS. ZVEROVICH:  Your Honor, the government's view is

6    that, with respect to the factors under the Bail Reform Act,

7    nothing has changed and there is nothing different about the

8    court's analysis that this defendant presents both a risk of

9    flight and a danger to the community and that no conditions can

10   satisfy those risks.

11             In fact, now that he's pled guilty to ten separate

12   felonies, there is a presumption of detention under 18 U.S.C.

13   3143.  The burden has shifted, and now it's on the defense to

14   prove by clear and convincing evidence that he is not a flight

15   risk and not a danger to the community, and the defense cannot

16   make that showing here.

17             With respect to the incident, I will just put on the

18   record that after the defense contacted the government about

19   it, we promptly acted to try to investigate it.  However, the

20   defense asks us not to do that based on safety reasons, telling

21   us that the defendant has now moved to a different cell and

22   that it's no longer an acute issue and asking us to drop that

23   line of inquiry.

24             So as a result the government has not been able to get

25   any clarification or information from the jail about this

1    incident.

2              THE COURT:  Well, what the government says about the

3    law is, of course, correct, but I don't think that's the whole

4    issue.  Conditions in the MDC have substantially in the last

5    few years.  In case after case after case, this court has been

6    apprised of serious incidents not unlike the one described here

7    today that have been visited upon various defendants.

8              I've spoken to a number of people about this,

9    including the Chief of the Criminal Division of the Southern

10   District of New York, and my colleagues Judge Caproni and Judge

11   Furman, who are independently monitoring this, and they say

12   that the ultimate problem is that the MDC is severely under-

13   staffed.

14             That makes me wonder whether I don't need to hold a

15   hearing now that this matter has been raised so often as to

16   whether this court has the power to either order the Bureau of

17   Prisons to devote more resources, economic resources to further

18   hiring qualified persons at the MDC, or if that is not within

19   my power or not reasonably practical, to order the release of

20   persons who otherwise would be detained but whose detention

21   places them in jeopardy of harm.

22             Having said all that, I'm not there yet.  So I think

23   where we will leave it for today.

24             By the way, has this incident -- let me ask the

25   prosecutor -- been reported to the Chief of the Criminal

N59sOCOp

1    Division?

2                MS. ZVEROVICH:  No, your Honor.

3                THE COURT:  I think you should do that in light of the

4    conversation that I had a few days ago about conditions in the

5    MDC.

6                MS. ZVEROVICH:  I will do that promptly, your Honor.

7                THE COURT:  All right.  I think where we'll leave it

8    for now, since apparently the MDC has taken some ameliorative,

9    something like that, mitigating steps by moving this defendant

10   into a different location within the MDC and is aware now of

11   the problem.

12               If we can get the sentence done within 45 days, as

13   previously indicated, I don't think I'm inclined at this point

14   to revisit my bail determination.  If they can't, probation

15   can't do the expedited sentence, then I might consider

16   revisiting it.  So when you call, if they can't -- if they can

17   do it, there is no reason to call, but if they can't do it,

18   then the call will see if we want to set a further hearing on

19   the bail.

20               All right.

21               MR. BROWN:  Thank you, your Honor.

22               MS. ZVEROVICH:  Thank you, your Honor.

23               THE COURT:  Very good.  Thanks a lot.

24               (Adjourned)

25