N6N3OCOS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                              21 Cr. 536 (JSR)
                                               23 Cr. 225 (JSR)
5   JOSEPH JAMES O'CONNOR,

6                  Defendant.

7   ------------------------------x    Sentencing

8                                       New York, N.Y.
                                        June 23, 2023
9                                       3:40 p.m.

10

    Before:
11
                         HON. JED S. RAKOFF,
12
                                        District Judge
13

14                        APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    OLGA I. ZVEROVICH
17       Assistant United States Attorney
              -and-
18  ISMAIL RAMSEY
         United States Attorney for the
19       Northern District of California
    ANDREW DAWSON
20       Assistant United States Attorney
              -and-
21  U.S. DEPARTMENT OF JUSTICE
    Criminal Division
22  ADRIENNE L. ROSE
         Assistant Deputy Chief, Intellectual Property
23       Computer Crime and Intellectual Property Section

24  DECHERT, LLP
         Attorneys for Defendant
25  JEFFREY BROWN
    NICHOLAS GERSH

N6N3OCOS

1        (Case called)

2            THE DEPUTY CLERK:  Will the parties please identify

3   themselves for the record.

4            MS. ZVEROVICH:  Good afternoon, your Honor.  Olga

5   Zverovich for the United States.  And I'm joined today by

6   Adrienne Rose from the Computer Crime and Intellectual Property

7   Section of the Department of Justice, as well as Andrew Dawson

8   who is an AUSA in the Northern District of California.

9            THE COURT:  Good afternoon.

10           MR. BROWN:  Good afternoon, your Honor.  Jeffrey Brown

11   and Nicholas Gersh from Dechert for the defendant Joseph

12   O'Connor who is seated to my right.

13           THE COURT:  Good afternoon.

14           So we have a very important sentence to take up, but

15   first, regretfully, we have what's called a Curcio hearing

16   because one of the lawyers who has worked for the defendant at

17   the Dechert firm, Mr. Gersh, has now applied for a position as

18   an assistant U.S. attorney in the Southern District of New

19   York.

20           So the government believes, I think correctly, that we

21   need to first put the questions to the defendant that

22   constitute what's called a Curcio hearing.

23           Now, the government, as is its want in Curcio

24   hearings, has proposed a measly 35 questions.  My feeling is it

25   could probably be done in about four.  But since it is the

N6N3OCOS

government that wants this, I am going to let the AUSA put any

and all questions she wants.  And then if there are any

followup questions, I'll put it.

So go ahead and put your questions to the defendant.

MS. ZVEROVICH:  Thank you, your Honor.  Would you like

me to speak from here or from the podium?

THE COURT:  Where you are is fine.

Mr. O'Connor, these are questions to you directly.

THE DEFENDANT:  Okay.

MS. ZVEROVICH:  Mr. O'Connor, how old are you?

THE DEFENDANT:  24.

MS. ZVEROVICH:  How far did you go in school?

THE DEFENDANT:  High school.

MS. ZVEROVICH:  Do you currently consult any doctor or

a mental health professional for any condition?

THE DEFENDANT:  No.

MS. ZVEROVICH:  Are you currently under the influence

of any alcohol, drugs, medication or pills of any kind?

THE DEFENDANT:  No.

MS. ZVEROVICH:  Do you understand what is going on

here today?

THE DEFENDANT:  Yeah.

MS. ZVEROVICH:  Are you feeling well enough to proceed

today?

THE DEFENDANT:  Yeah.

N6N3OCOS

1          MS. ZVEROVICH:  Now Mr. O'Connor, are you currently

2    represented by Jeffrey Brown and Roger Burlingame as well as

3    others from the firm Dechert?

4          THE DEFENDANT:  Yes.

5          MS. ZVEROVICH:  Are the lawyers appointed or retained?

6          THE DEFENDANT:  Retained.

7          MS. ZVEROVICH:  Has Nicholas Gersh of the same law

8    firm been involved in your representation as well?

9          THE DEFENDANT:  Yes.

10          MS. ZVEROVICH:  Do you understand that Mr. Gersh has

11    applied for a position as a federal prosecutor with the United

12    States Attorney's Office for the Southern District of New York?

13          THE DEFENDANT:  Yes.

14          MS. ZVEROVICH:  Do you understand that that office is

15    the same office prosecuting this case?

16          THE DEFENDANT:  Yes.

17          MS. ZVEROVICH:  Now, Mr. O'Connor, you should

18    understand that under the U.S. Constitution and the laws of the

19    United States, you are entitled to the aid and assistance of

20    counsel at all stages of this proceeding.  Do you understand

21    that?

22          THE DEFENDANT:  Yes.

23          MS. ZVEROVICH:  You are entitled to counsel of your

24    choice, unless there is some strong legal reason to disqualify

25    that counsel.  Do you understand that?

N6N3OCOS

| 1 | THE DEFENDANT: Yes. |

          THE DEFENDANT:  Yes.

          MS. ZVEROVICH:  And do you understand that if you

can't afford a lawyer, one could be appointed to you at no

cost?

          THE DEFENDANT:  Yes.

          MS. ZVEROVICH:  Now, it is an essential principle in

criminal law that you are entitled to a lawyer who has no

conflicts or adverse interests of any kind.  Do you understand

that?

          THE DEFENDANT:  Yes.

          MS. ZVEROVICH:  That means that your lawyer, unless it

is with your express knowledge and consent, cannot have any

conflicting interests in this case.  Do you understand that?

          THE DEFENDANT:  Yes.

          MS. ZVEROVICH:  You have the right to the assistance

of a lawyer whose loyalty to you is undivided and who is not

subject to any factor that may intrude a non-loyalty to you.

Do you understand that?

          THE DEFENDANT:  Yes.

          MS. ZVEROVICH:  And the purpose of this principle of

law is to ensure that you have the full devoted defense

furnished to you by a lawyer who has no possible other interest

in this case.  Do you understand that?

          THE DEFENDANT:  Yes.

          MS. ZVEROVICH:  Do you understand that it may be

N6N3OCOS

1    ill-advised for you to have a lawyer who has a potential

2    conflict of interest?

3              THE DEFENDANT:  Yes.

4              MS. ZVEROVICH:  Now, do you understand that

5    Mr. Gersh's application for employment with the U.S. attorney's

6    office as a prosecutor creates the potential, the possibility,

7    that he may have allegiances or interests that may be adverse

8    to your own?

9              THE DEFENDANT:  Yes.

10             MS. ZVEROVICH:  Do you understand that it's possible

11   that Mr. Gersh may not be as zealous or as earnest in his

12   representation as he may otherwise be if he did not apply to

13   the U.S. attorney's office?

14             THE DEFENDANT:  Yes.

15             MS. ZVEROVICH:  For example, there is the possibility

16   that he may seek to curry favor with the U.S. attorney's office

17   instead of pursuing your best interests.  Do you understand

18   that?

19             THE DEFENDANT:  Yes.

20             MS. ZVEROVICH:  Do you understand that if you decide

21   to proceed with Mr. Gersh, Mr. Brown, Mr. Burlingame, and your

22   other lawyers from Dechert, that you would be waiving any

23   argument after your sentencing that your lawyers were

24   ineffective or deficient in their representation of you,

25   because of Mr. Gersh's potential conflict of interest?

N6N3OCOS

```
1              THE DEFENDANT:  Yes.

2              MS. ZVEROVICH:  Have you discussed these conflicts of

3    interest issues with Mr. Gersh and your other lawyers?

4              THE DEFENDANT:  Yes.

5              MS. ZVEROVICH:  Are you satisfied with your lawyers'

6    representation of you?

7              THE DEFENDANT:  Yes.

8              MS. ZVEROVICH:  Please describe in your own words your

9    understanding of the potential conflict of interest in this

10   case.

11             THE DEFENDANT:  None.

12             THE COURT:  You understand, don't you, that in theory,

13   at least, because Mr. Gersh is applying to the U.S. attorney's

14   office, he might not be as devoted to your interests as he

15   should be under the law?  Do you understand that at least

16   theoretical possibility exists; yes?

17             THE DEFENDANT:  In theory, yes.

18             THE COURT:  Okay.  Very good.  Go ahead.

19             MS. ZVEROVICH:  And Mr. O'Connor, do you understand

20   that this potential conflict has existed since the time that

21   Mr. Gersh first applied to the U.S. attorney's office?

22             THE DEFENDANT:  Yes.

23             THE COURT:  Just out of curiosity, when was that?

24        I am asking counsel.

25             MR. GERSH:  I don't have the exact date unfortunately.
```

N6N3OCOS

| | |
|---|---|
| 1 | It was some time after the change of plea hearing before your |
| 2 | Honor. |
| 3 | THE COURT:  Some time? |
| 4 | MR. GERSH:  After the change of plea hearing before |
| 5 | your Honor. |
| 6 | THE COURT:  I see.  Okay.  And he dropped out of the |
| 7 | representation after that? |
| 8 | MR. GERSH:  I'm Mr. Gersh. |
| 9 | THE COURT:  You're Mr. Gersh? |
| 10 | MR. GERSH:  I'm still involved in the representation. |
| 11 | THE COURT:  Oh my gosh.  You are still here confronted |
| 12 | with this potential looming conflict of interest.  What a brave |
| 13 | fellow to be here all by yourself. |
| 14 | So, anyway, but why didn't you drop out of the |
| 15 | representation after you applied? |
| 16 | MR. GERSH:  I've been involved in representing |
| 17 | Mr. O'Connor for multiple months, I formed a rapport with him, |
| 18 | I visited him in MDC multiple times, and I felt that I could |
| 19 | continue to provide zealous representation for him.  I |
| 20 | understand theoretically the rationale for the creation -- |
| 21 | THE COURT:  Why didn't you just hold off making your |
| 22 | application to the U.S. attorney's office for a few months? |
| 23 | MR. GERSH:  Your Honor, I felt like it was a proper |
| 24 | time.  I honestly -- I felt like it was the proper time, your |
| 25 | Honor. |

N6N3OCOS

1          THE COURT:  You understand that they only hire people

2     who are brilliant.  I assume you fit that category, right?

3          MR. GERSH:  Determined to be seen, your Honor.

4          THE COURT:  Go ahead, counsel.

5          MS. ZVEROVICH:  Thank you, your Honor.

6          So Mr. O'Connor, do you understand that your lawyer's

7     potential conflict has existed since the time that Mr. Gersh

8     applied to work for the U.S. attorney's office?

9          THE DEFENDANT:  Yes.

10          MS. ZVEROVICH:  And do you understand that while

11     Mr. Gersh's application was pending, he did additional work on

12     your case?

13          THE DEFENDANT:  Yes.

14          MS. ZVEROVICH:  Do you understand that you have the

15     right to consult with an independent lawyer, other than your

16     lawyers from Dechert, to discuss these issues and to determine

17     whether you want Mr. Gersh and your other lawyers from Dechert

18     to continue to represent you?

19          THE DEFENDANT:  Yes.

20          MS. ZVEROVICH:  Do you understand that the Court will

21     give you an opportunity to consult with that independent

22     lawyer, and that the Court may even encourage you to do that?

23          THE DEFENDANT:  Yes.

24          MS. ZVEROVICH:  Do you understand there is an

25     independent lawyer here in the courtroom that you can talk

N6N3OCOS

1    about these issues with?

2              THE DEFENDANT:  Yes.

3              MS. ZVEROVICH:  And do you understand that your

4    discussions with that independent lawyer would be private and

5    confidential?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Do you want to talk to that lawyer or not?

8              THE DEFENDANT:  No, thank you.

9              THE COURT:  Go ahead.

10             MS. ZVEROVICH:  Now I would like to pose some

11   questions to Mr. Gersh, your Honor?

12             THE COURT:  Well, he's so intimidated by my prior

13   questions, he'll barely be able to answer, but let's go ahead

14   anyway.

15             MS. ZVEROVICH:  Mr. Gersh, did you discuss the

16   potential conflict of interest with your client, Mr. O'Connor?

17             MR. GERSH:  I did.

18             MS. ZVEROVICH:  Do you feel he understands the

19   possible risks of being represented by a lawyer with the

20   potential conflict?

21             MR. GERSH:  I do.

22             MS. ZVEROVICH:  Is there anything else that you would

23   like to put on the record to inquire about this issue?

24             MR. GERSH:  No.

25             MS. ZVEROVICH:  Thank you.

1      Mr. O'Connor, do you have any other questions or do

2  you wish to take any time to think about this issue further?

3      THE DEFENDANT:  No, thank you.

4      MS. ZVEROVICH:  Would you like the opportunity to

5  consult either with your current counsel or with the

6  independent lawyer?

7      THE DEFENDANT:  No, thank you.

8      MS. ZVEROVICH:  Have you had enough time to consider

9  this potential conflict of interest issue and to discuss it

10 with your lawyer?

11     THE DEFENDANT:  Yes.

12     MS. ZVEROVICH:  Do you wish to proceed with Mr. Gersh,

13 Mr. Brown, Mr. Burlingame, and your other attorneys from

14 Dechert as your lawyers in this case?

15     THE DEFENDANT:  Yes.

16     MS. ZVEROVICH:  Are you knowingly and voluntarily

17 waiving your right to conflict-free representation?

18     THE DEFENDANT:  Yes.

19     MS. ZVEROVICH:  Have you received any inducements or

20 any promises about your choice of counsel in this case?

21     THE DEFENDANT:  No.

22     MS. ZVEROVICH:  Have you been threatened or coerced in

23 any way about your decision on this issue?

24     THE DEFENDANT:  No.

25     MS. ZVEROVICH:  Do you agree to waive all future

N6N3OCOS

```
1   arguments, whether on appeal or anywhere else, that you were
2   denied effective assistance of counsel or were otherwise
3   prejudiced in any way because of Mr. Gersh's application to the
4   U.S. attorney's office?
5              THE DEFENDANT:  Yes.
6              MS. ZVEROVICH:  That's it, your Honor.
7              THE COURT:  Very good.  I congratulate you on your
8   reading capabilities.
9              So, now let's get serious.
10             Sir?
11             MR. BRESLIN:  Your Honor, I am the CJA duty lawyer
12  today.  May I be excused?
13             THE COURT:  Yes, you may.  Thank you very much.
14             So we're here for sentence.  And the first item of
15  business required by law is to calculate the sentencing
16  guideline range, even though, as this Court now states I
17  believe at every sentence, after careful study I have concluded
18  that the sentencing guidelines are wholly and irretrievably
19  irrational and of no meaningful use to this or any other Court.
20  Nevertheless, I'm required by law to calculate them, and so we
21  will.
22             So, the probation office in the presentence report
23  suggests that the total offense level is 27, criminal history
24  category is I, and the guideline range is therefore 70 to 87
25  months in prison.
```

N6N3OCOS

1          Any disagreement with that on the part of the

2     government?

3          MS. ZVEROVICH:  No, your Honor.

4          THE COURT:  On the part of defense?

5          MR. BROWN:  No, your Honor.

6          THE COURT:  So I'll adopt that calculation and adopt

7     the presentence report.

8          So now let's get to what is of great importance to the

9     Court, which is to hear from counsel and from the defendant, if

10    he wishes to be heard, about what sentence this Court should

11    impose under the factors set forth in Section 3553 of Title 18,

12    a statute that this Court regards as a very fair, balanced

13    statement of all the factors that should go into an informed

14    sentencing.

15         So, let me hear first from defense counsel, then from

16    government counsel, and then from the defendant if he wishes to

17    be heard.

18         MR. BROWN:  Your Honor, thank you.  This is

19    undoubtedly serious conduct at issue, and our client

20    acknowledges it and you'll hear from him in a moment.  He's

21    taken responsibility for it by pleading guilty immediately when

22    he arrived, and we don't diminish any of the conduct alleged in

23    the indictment and the information that have been consolidated

24    here.

25         We do think that when properly viewed, the combination

N6N3OCOS

1    of the conduct and the defendant's history and characteristics,

2    provide a meaningful reason for leniency and mercy here.  We're

3    asking for a sentence of time served.  We've noted that in our

4    briefing to your Honor.

5              THE COURT:  Let me ask a question, and this is also

6    for the government.  It's necessary to interrupt for just a

7    minute.

8              Am I right in thinking that whatever sentence I impose

9    will not, under Bureau of Prisons practices, be reduced by any

10   of the time that the defendant served in prison in Spain?

11             MS. ZVEROVICH:  Your Honor, I actually have looked

12   into that question previously in connection with another case

13   with a similar procedural posture, and I believe that they

14   will.  The BOP will credit time served in the foreign country

15   against the sentence this Court will impose.

16             THE COURT:  Okay.  All right.  That's useful to know.

17   Does defense counsel agree with that?

18             MR. BROWN:  That's consistent with my understanding,

19   your Honor.

20             THE COURT:  Excellent.  Excellent.  Go ahead.

21             MR. BROWN:  So, a sentence of time served functionally

22   in this case, your Honor, given the time that my client spent

23   in prison in Spain for 24 months approximately, the time he

24   spent here in the MDC, and then what we expect will be some

25   period of detention in an ICE facility prior to deportation,

N6N3OCOS

1    estimated to be approximately three or four months, I can't

2    pinpoint that exactly, roughly ends up with a functional

3    sentence of 27 or 28 months in prison.  We submit that's more

4    than enough to satisfy the principles that are set forth in

5    Section 3553(a).

6          We've written extensively to you in our submission

7    about some of the reasons why we believe there are mitigating

8    factors here, and I don't intend to repeat them.  You gave us

9    some extra pages to brief you, and we're grateful for that

10   opportunity, so I want to use my time here a bit more

11   pointedly.  And obviously, if there is anything that you want

12   to hear about, more than what I'm talking about, stop me and

13   direct me in the right place, because I intend most to meet

14   your questions and to address myself to the things that are

15   most on your mind.

16         For me, I want to spend time where I think it is most

17   important in the calculation here, which is the age of the

18   defendant, and particularly his age when he committed the

19   offenses that are alleged.  He was 20 years old.  That's a

20   substantial majority of the offenses.  21 at the oldest for the

21   other ones.  I think it is particularly important in your

22   consideration of what's appropriate for him, and I think that

23   in a certain way it creates a disparity, and I want to address

24   why.  I think if treated as his biological age, as a 20 year

25   old, there is a disparity about the way that this sentence will

N6N3OCOS

1    impact him, and I want to unpack that a bit as we move forward.

2        Your Honor knows there is a mountain of science about

3    brain development and the prefrontal cortex and the question of

4    when you develop adult judgment, and the majority of the

5    opinions is it is at least not before the age of 25.  And that

6    science effectively maps with the jurisprudence about how we

7    treat youthful offenders.  Everything goes in the direction

8    that younger offenders should be treated with a degree of

9    leniency and with a degree of consideration about how their

10   young age impacts their decision making and got them into the

11   trouble that they've gotten into.  In the jurisprudence, the

12   age is 18 for majority.  And I don't think that anyone would

13   disagree that of course you don't become a functioning adult at

14   the flip of a light switch when you turn 18.  And so, when you

15   are in the vicinity of that age, you're much like an 18 year

16   old or 17 year old when you are 19 or 20.

17       We think that's particularly important here, because

18   we think the emotional maturity of Joseph at the time that he

19   committed these offenses was that of probably someone who was

20   younger than his biological age for the reasons that we've set

21   forth in our briefing to you, including his autism diagnosis,

22   which is substantiated by a report from the one of the world's

23   foremost experts on the subject.  That unequivocally matters in

24   the sentencing analysis here.

25       You have been on the bench for a long time.  Judge, I

N6N3OCOS

1  was an AUSA in this district for a decade.  To see someone be

2  sentenced for crimes in this court that were committed when

3  they were 20 years old is exceedingly rare.  And it usually, in

4  my experience, involves significant violence, a shooting, a

5  murder.  People at the age of 20 are not often charged with

6  federal crimes.  That's my experience.  Of course, that's

7  anecdotal, I don't know if it meets with your experience, but

8  that's my experience, and there are good reasons for that, and

9  I think you understand them.

10      Here, Joseph has been charged with 10 federal crimes.

11  When you look at the descriptions of the offense conduct, your

12  Honor, we submit that it's pretty evident that Joseph and his

13  co-conspirators were children, and some of them were in fact

14  juveniles and they are identified as juveniles in the

15  government's submission.  If you look at questions of naivete,

16  limited judgment, impulsivity, the inability to consider the

17  consequences of your actions, I think those issues were

18  aggravated by Joseph's autism.  But even at the age of 20, if

19  he really were that biological age, this would be an important

20  consideration for what the sentence is.

21      We do think that creates a bit of disparity.  There

22  are juveniles who were involved in these offenses who were not

23  prosecuted to my knowledge.  If they were, they were prosecuted

24  as juveniles, and they were prosecuted I think gently.

25      We agree that youthful offenders in our system should

1    be given leniency.  I think a significant degree of that same

2    leniency applies to Joseph.

3            The government's described him at various times in

4    their sentencing submission as methodical, deliberate,

5    calculating.  And I think the greater weight of the evidence

6    here is that these crimes were haphazard, they were impulsive,

7    they were childish, and their reasons for engaging in this

8    conduct were ultimately childish.  They involved increasing

9    their prominence on the internet.

10           Joseph will tell you, I expect, that he feels

11   embarrassed by how childish these things were, while

12   acknowledging at the same time the harm that they caused.

13           Why does age matter in particular?  Here, he's two

14   years older than he was, three years older than he was when he

15   committed these crimes.  He's a different person.  He's had an

16   experience of being in jail.  He's had an awakening about his

17   conduct.  He understands better his condition and how to manage

18   it, and how it can lead him astray.  He's been disconnected

19   from the environment in which he had isolated himself, and it

20   is a toxic environment, undoubtedly, the part of the internet

21   where he was spending all of his time, effectively.  And I

22   think he understands now all of the reasons why his life and

23   his conduct at that time were leading him astray.  People were

24   leading him astray and causing him to commit harm that is

25   really not reflective of who he is as a person and what his

1    character is.

2            And so, I submit to you that he is changed in respect

3    of specific deterrence.  There is no reason to impose further

4    jail time.  We've written to you about the particular

5    difficulties that someone with his condition experiences being

6    in jail.  That's particularly acute here at the MDC.  We've

7    written to you and reported to you about things that have

8    happened there.  I do think that he is particularly vulnerable

9    in the prison environment, and I think it is acutely punitive

10   to him to be in that environment, and I would certainly ask

11   your Honor to consider that.

12           But I think he has grown.  I think he is a different

13   person.  I really do think you are going to hear a remorseful

14   person when he speaks.  And I do think that, principally, his

15   age and the way it was aggravated by his condition are

16   meaningful factors in how he came to commit these offenses,

17   which now he is incredibly ashamed of, of course.  There has

18   been a huge price he's already paid.

19           And I want to close with an observation that I have,

20   which is the last time I was present or involved in a

21   sentencing that you conducted, I represented some witnesses in

22   the MiMedx trial, so Taylor and Petit.  So I had the

23   opportunity to listen to the sentence.  It was curing COVID, so

24   I was remote.  And those were adult, sophisticated businessmen,

25   one in his 50s or 60s the other in his 80s, engaged in a

N6N3OCOS

1    sustained accounting fraud that was sophisticated, harmed

2    thousands of shareholders, people lost their jobs. A

3    significant crime. And there were many, many mitigating

4    circumstances that your Honor considered, including good works

5    that were done by the defendants. But I think, you know,

6    they're entrepreneurial. They provided for people and

7    supported people over the course of their lives. And I believe

8    you sentenced them to a year and a day. There were medical

9    issues relating to one of the defendants.

10           I'm not making a disparity argument, I am not

11   comparing these two cases. But I think if you are guided by

12   the same principles in thinking about Joseph that guided you, I

13   think always, but using that sentence as a particular example,

14   it's hard to see how a sentence more than twice what was served

15   or imposed upon those defendants serves the purposes of

16   3553(a).

17           I know there is no perfect comparison between any two

18   cases. But I do believe that the time that Joseph has spent in

19   prison has been more than enough to change him, is more than

20   enough to express to the community the seriousness of his

21   crimes, and any further incarceration is particularly acutely

22   punitive to him. So we're really asking for your leniency,

23   your Honor, and your mercy.

24           THE COURT: Thank you very much.

25           We'll hear now from the government.

N6N3OCOS

```
1          MS. ZVEROVICH:  Thank you very much, your Honor.

2          Your Honor, the slew of crimes that Mr. O'Connor

3     perpetrated in this case were extremely serious crimes.  For

4     almost a year and a half, while sitting behind the computer

5     screen, overseas, the defendant methodically targeted and he

6     victimized many people, companies, victims, in the United

7     States.

8          The government has addressed some of the defense's

9     arguments in its submission, and I may get to them later in my

10    remarks, but I think it does not do these crimes justice to say

11    that he was a child and that the crimes were childish.  These

12    were not childish crimes.  These were methodical,

13    sophisticated, diverse crimes that caused really substantial

14    harm to the victims.

15          As the Court knows, Mr. O'Connor stands to be

16    sentenced today on two separate federal cases.  These cases

17    were brought independently in two different districts.  And

18    although the cases were consolidated before the Court, and

19    Mr. O'Connor stands to be sentenced together on them, the

20    government submits that this Court should consider each of

21    Mr. O'Connor's crimes independently as it considers the Section

22    3553(a) factors, because each of his crimes seriously affected

23    a specific victim or victims, caused that victim substantial

24    harm, and it deserves to be considered independently.

25          The first of Mr. O'Connor's crimes, which was charged
```

N6N3OCOS

1    in what we've been calling the S.D.N.Y. case, involved

2    attacking a cryptocurrency company based here in Manhattan.

3    Through that attack Mr. O'Connor and his co-conspirators

4    successfully stole a large amount of cryptocurrency that the

5    company was holding on behalf of two of its clients.  That

6    cryptocurrency was valued at nearly $800,000 at the time of the

7    attack in 2019.  Today it is worth over $1.6 million.

8            Contrary to his claim this was just childish behavior,

9    far from it.  Mr. O'Connor and his co-conspirators stole that

10   money in a very sophisticated way.  They laundered it very

11   quickly through a complex web of transactions, dozens of

12   transfers, the use of what's called mixers and tumblers, which

13   are tools designed to make tracing of that cryptocurrency more

14   difficult.  And as a result of that, despite very substantial

15   effort, the government has been unable to recover any of that

16   stolen cryptocurrency and return it to the victims.

17           The company through its counsel has submitted a victim

18   impact statement to your Honor.

19           THE COURT:  Yes.

20           MS. ZVEROVICH:  And that statement describes the

21   havoc, both financial and non-financial, that Mr. O'Connor's

22   crimes caused to the company.  Talks about reputational damage

23   in the industry, it talks about stress and anxiety.  And this

24   is a small company, your Honor, that its founders and employees

25   all suffered as a result of the defendant's criminal actions.

N6N3OCOS

1          Now, in his sentencing memo, Mr. O'Connor says, well,
2   this type of attack, I stole a lot of money, it was a wake-up
3   call.  But it wasn't a wake-up call.  Just two week later, he
4   did a similar attack on three other victims, individuals.
5   These victims were not part of the charged conduct, but they
6   are relevant conduct, and the plea agreement includes a
7   restitution provision for these victims.  This was in May of
8   2019.  In mid-May, Mr. O'Connor gained unauthorized access to
9   each of the victims' cryptocurrency accounts and he stole their
10  Bitcoin.
11          One of those individuals that we have been referring
12  to as S.D.N.Y. Victim 3 also submitted a victim impact
13  statement to the Court.  In there he describes how that attack
14  changed his life.  The cryptocurrency that Mr. O'Connor stole
15  was valued at approximately $100,000, and that was 90 percent,
16  almost all of that victim's net worth.  He describes how that
17  attack caused him substantial emotional harm, anxiety, loss of
18  trust, and a sense of loss, and a sense of being violated.
19          And I think it's notable, your Honor, that while
20  Mr. O'Connor wants the Court to consider how he took
21  responsibility for these crimes, he pled quickly after coming
22  to the United States, it's notable that he has paid not one
23  penny in restitution to any of these victims.  These attacks
24  were over four years ago.  He made no effort at all, not even a
25  small one.  As I mentioned, the government, despite spending

N6N3OCOS

1    substantial resources and effort, has been unable to recover

2    the cryptocurrency that was stolen.

3            Now, your Honor, everything that I just talked about

4    up until this point is just the S.D.N.Y. case.  The government

5    submits that these crimes alone are very substantial, very

6    serious, and require substantial punishment.  But the Court

7    must also sentence Mr. O'Connor for the litany of serious

8    crimes that he committed in the separately brought N.D.C.A.

9    case.

10           And one point that we made, and the government knows

11   the Court's views about the guidelines, but to the extent the

12   Court even thinks about the guidelines, the guidelines here are

13   based almost entirely on the S.D.N.Y. conduct.  The N.D.C.A.

14   conduct contributes one offense level.  That one offense level

15   stems only from the Twitter hack.  So the N.D.C.A. victims, the

16   individuals who were targeted, harassed, abused by

17   Mr. O'Connor, not factored in the guidelines at all.

18           THE COURT:  You reinforce my view of the guidelines.

19           MS. ZVEROVICH:  Yes, your Honor.  And look, in

20   different cases, it works in different ways.  But here, I think

21   as the Court balances both the seriousness of the crime, the

22   mitigating factors present in the case, it is relevant that the

23   range that is sort of the anchoring point doesn't take into

24   account a whole large swath.

25           THE COURT:  I understand your point.  I think it is a

N6N3OCOS

1  good point, but it also again does illustrate how silly the

2  guidelines are.

3       MS. ZVEROVICH:  As the Court knows from the

4  presentence report, from the parties' submissions, the N.D.C.A.

5  case involved very serious conduct targeting really four

6  victims.  One was Twitter, which was another U.S. company that

7  the defendant targeted from overseas, as well as three

8  individuals who the defendant targeted through malicious

9  attacks, threats, extortion, and swatting attacks.

10      The government submits that his conduct with respect

11  to the individual victims was particularly callous and

12  egregious, and it got worse.

13      The defendant hacked a TikTok account belonging to a

14  19-year-old social media personality.  He changed the user name

15  on that account, he used her account to promote himself and his

16  co-conspirators, and he posted videos to that account offering

17  to share nude photographs of the victim with others.

18      With victim 2, the defendant went much further than

19  that.  He similarly hacked her Snapchat account, but in that

20  case he actually used his unauthorized access to steal

21  photographs, sensitive nude photographs and videos of the

22  victim.  He then sent those photographs and videos to his

23  criminal associates.  He also posted messages on the victim's

24  account promoting himself, offering to share those sensitive

25  images with other people.  One of Mr. O'Connor's

N6N3OCOS

co-conspirators who received multiple of these photographs and

videos, then used that to extort the victim, threatening to

publish them publicly.  And Mr. O'Connor received a screenshot

of that text message exchange between his associate and the

victim.

And ultimately to avoid being extorted, and at big

emotional cost, the victim decided to publicly release her own

sensitive private images to the public by posting them on

Twitter.  I can only imagine how difficult of a decision that

was.

And victim 2, after Mr. O'Connor's arrest, made a

public statement about how difficult that decision was, and she

also submitted a victim impact statement to your Honor as well.

And in that victim statement, she describes the continued

mental torment that she's experiencing knowing that her images,

her videos, her most private things are out there online, even

to this day, and that it's impossible to erase them from there.

This torment has affected the victim deeply.  She says

it affected her eating habits, her sleeping, her perception of

herself.  And that harm, your Honor, is very real harm that

needs to be considered by the Court, and, again, something

that's not reflected in the sentencing guidelines.

Perhaps Mr. O'Connor's most egregious conduct came

later with victim 3, and victim 3 was a minor.  She was 16

years old at the time.  And Mr. O'Connor attacked and abused

N6N3OCOS

her endlessly.  He sent her graphic sexual messages, even though he knew that she was a minor.  He called up her relatives and threatened to kill her relatives.  And on a particular day, he perpetrated a slew of what's called swatting attacks.  He pretended to be victim 3, and he called up police departments, a fire department, he e-mailed a high school.  He threatened to commit mass shootings, he threatened to kill law enforcement, he threatened to kill his wife and children, all on calls with law enforcement.  And the Court has read the details of those vicious attacks.  And that, unsurprisingly, prompted a very strong police response on that day, because the police thought it was a huge emergency, which is what Mr. O'Connor said it was.  And that of course took away much needed police resources from addressing real emergencies.  Needless to say, this caused significant emotional, psychological harm to the victim, and put others in danger.

All of this taken together, your Honor, shows that Mr. O'Connor committed a litany of serious crimes in this case.  Even though he is a first-time offender, he's category I under the guidelines, these were independently serious, harmful, destructive crimes that he committed, and he didn't commit them on a single day.  This was over a period of about a year and a half that he was doing this.

The government also submits that both specific and general deterrence have are very important in this case.  With

N6N3OCOS

respect to general deterrence, the government discusses this in
its sentencing submission, but we would submit that computer
crimes are really in a class of themselves for several reasons.
Because they are very easy to perpetrate, they can be committed
from a computer anywhere in the world, they can be extremely
destructive -- as they were in this case -- causing financial,
emotional damage to victims, they undercut the trust that
society has in computer systems, and they are most importantly,
maybe for general deterrence, these crimes are very difficult
to investigate and prosecute effectively.  Cyber criminals use
a whole slew of tools to mask their identity.  They make their
crimes very difficult to detect.  And even if the crime is
detected, it is very difficult to detect who committed it.  And
even when the government is able to find out who committed it,
it often turns out to be the case that the perpetrator is
someplace abroad, sometimes in countries from which we cannot
extradite them.

          And so, if you take computer crimes as a whole, they
are extremely pernicious, they are very common, they're
growing, and they're very difficult to detect and to prosecute.

          And so, the government would submit to your Honor that
in order to achieve general deterrence in this area, the
Court's sentences in cases that do get prosecuted and brought
before the Court must be substantial.  They must be substantial
enough to send a message to others that if you do this and you

N6N3OCOS

1    get caught, you will be seriously punished.

2        And finally, your Honor, just briefly on the

3    mitigating arguments cited by the defense.  The government, as

4    it did in its sentencing submission, does acknowledge that

5    there are mitigating factors.  We have considered them.  The

6    defendant certainly is young, although he was an adult when he

7    committed these crimes, he is an adult now.  But certainly, his

8    age, the fact that he previously did not have a documented

9    criminal history, are things the Court should consider.

10        But none of these factors, your Honor, diminishes,

11   excuses, or justifies Mr. O'Connor's crimes.  Because as he

12   allocuted at his plea hearing, the Court asked a very specific

13   question, and the defendant answered it unambiguously.  Each

14   time he was victimizing these people, each time he was

15   committing these offenses, he understood that he was committing

16   a crime.  He said he knew that he what he was doing was wrong

17   and that it was illegal, and yet he did it anyway.  And he did

18   it not once, not twice, not three times, but repeatedly.

19        And so balancing all of these different

20   considerations, your Honor, and as the Court saw from our

21   sentencing submission, we submit that a sentence of seven

22   years' imprisonment would be an appropriate sentence, a fair

23   sentence, and one that's necessary to meet the sentencing

24   purposes in this case.

25        THE COURT:  Thank you very much.  We'll hear from the

N6N3OCOS

1    defendant if he wishes to be heard.

2                THE DEFENDANT:  Yes, please.  Thank you, your Honor.

3            I am ashamed to be here.  I'm sorry to all the victims

4    of my crimes.  I'm being punished because I did stupid,

5    shameful things, and I'm truly embarrassed.  I had no right to

6    interfere with their lives.

7            I know it doesn't take away what I did, but I'm truly

8    sorry, and I deeply regret all the pain and the stress I've put

9    them through.  I apologize to the courts, the prosecution, the

10   FBI, the probation officers, the prison guards, and everyone's

11   time who I've wasted.  I apologize to the law enforcement

12   officials whose lives I put in danger.  I apologize to the

13   taxpayers' resources I wasted.

14           My crimes were stupid and pointless, and I am ashamed

15   of who I was.  That person no longer exists.  I'm not that

16   person today.  I will never be that person again.  I never -- I

17   will never come back to prison.  I'll never break the law

18   again.  I want to live a life that matters.  Not the empty,

19   idiotic life I was living.

20           I am thankful for my family and I'm sorry for what I

21   put them through.  I apologize to my mother and I am ashamed of

22   everything I put her through.  She sacrificed everything for

23   me, and I know she would sacrifice her life for me.  I wish I

24   could repay her for all the stress I put her through.  I know I

25   can't repay, but I can live a better life to be the kind of

1    person she taught me to be.

2            I am thankful for having my family and being able to

3    have a future when I finish prison.  I know not everyone has

4    these luxuries of having a family that supports them, and I

5    will never waste my life again.

6            I'm very sorry.  Thank you for allowing me to

7    apologize and speak, your Honor.  And thank you for your

8    consideration.

9            THE COURT:  Thank you very much.

10            So, while the Court always applies all the factors

11    under Section 3553, the two that I usually spend the most time

12    focusing on, and certainly have done so in this case, are,

13    first, the nature of the human being, the fellow human being

14    who I'm being asked to punish.  And second, the effect of his

15    or her crimes on the victims.

16            Here, on the first factor, there are important things

17    to take into account by way of mitigation.  The defendant's

18    relative youth, his autism, the fact that, even independent of

19    autism, the nature of the development of the brain is such that

20    meaningful control over impulses to do the wrong thing is not

21    nearly as easily exercised at the age that he was at when these

22    crimes were committed as it would be much later.  None of that

23    is an excuse, of course, but it is a mitigating factor, because

24    it suggests, among other things, that on the one hand, the

25    defendant was not operating with full adult control over his

N6N3OCOS

1    conduct at the time he committed these crimes, and that on the

2    other hand, there is good reason to hope that he can still

3    become a law-abiding, productive citizen.

4         We turn to the victims, however, it is striking how

5    much harm he imposed.  The cryptocurrency crimes are too easily

6    dismissed as, "oh, it's just money."  But as the information

7    furnished to the Court makes clear, this had serious impacts on

8    the lives of some of the victims of the theft.

9         However, the more obvious and also more telling harm

10   was the victims of the California indictment, the California

11   crimes that substantially ruined for a time the lives of other

12   young people, made them vulnerable to threats, extortions,

13   exploitations, at a time in their life when they were young,

14   and when their entire future was being clouded by the crimes

15   committed by the defendant.

16        I do not minimize either of the kinds of crimes

17   committed here, but I must say, to this Court, at least, it is

18   what I'll call the California crimes, crimes embraced in the

19   California indictment, that are so heartbreaking in the pain

20   that they caused and continue to cause.

21        Now, when we get to questions like general deterrence,

22   specific deterrence, while those are things that the Court has

23   to take account of, those are much harder to translate into any

24   specific amount of prison time.  So far as specific deterrence

25   is concerned, I think there is good reason to believe that this

N6N3OCOS

defendant will not commit future crimes.

So far as general deterrence is concerned, I agree with the government that the very nature of computer crimes, the difficulty of detecting them, the great harm they can impose, and the need for society to reckon with those dangers, all call for a meaningful amount of general deterrence. But in some ways, I find that less able to be translated into a specific amount of time than I do the factor that the statute also focuses on, which is just punishment. In effect, "just punishment" is a Congressional word for upholding basic standards of decency and morality, and letting anyone who violates those basic standards know that punishment will be severe.

So weighing all those factors, I think the right sentence is five years. 60 months. Of course, I'm glad to know that 28 of those months or so approximately will be credited, so the defendant has already served or will shortly serve a little less than half of that time, and I'm grateful that the Bureau of Prisons will give him credit for that. But I think that's overall the right sentence.

Now, because of the multiple counts here, I think that translates as follows: On 21 Cr. 536, that is 60 months concurrent on Counts One, Two, and Four.

On 23 Cr. 225, it is 60 months concurrent with the other counts in 21 Cr. 536, and 60 months concurrent as well on

N6N3OCOS

1     counts One, Two, Three, Five, Six, and Seven.

2              With respect to Count Four of 23 Cr. 225, the sentence

3     is 24 months to run concurrent with all the other 60-month

4     concurrent counts.

5              In addition, supervised release will be imposed of

6     three years, again, concurrent on all the counts previously

7     mentioned, except for Count Four of 23 Cr. 225, where it will

8     be one year concurrent with the other three years of supervised

9     release.

10             No fine will be imposed because there is restitution

11    in the amount of $2,264,694.35.

12             MR. BROWN:  Your Honor, could I be heard briefly on

13    restitution.

14             THE COURT:  Sure.  But let me just finish the rest of

15    the sentence and we'll talk about restitution.

16             I must say, I'm eager to hear you on that, because I

17    think the history of the collection of restitution in the

18    American legal system is one of hypocrisy.  Huge amounts

19    imposed, small amounts collected.

20             Let's get back to the terms of supervised release so I

21    don't omit them.

22             The terms of supervised release are:  First, the

23    mandatory conditions that the defendant not commit any further

24    federal, state or local crime; that he not unlawfully possess a

25    controlled substance; that within 15 days of his release from

N6N3OCOS

1    prison, he submit to one drug test within that period plus at

2    least two periodic drug tests thereafter; that he make

3    restitution in an amount we'll talk about in a minute; and that

4    he cooperate in the collection of DNA.

5           There will also be imposed the standard conditions 1

6    through 12.  They appear on the face of the judgment and will

7    be gone over with the defendant once he reports to begin his

8    period of supervised release.  And he must report to the

9    nearest probation office within 72 hours of his release from

10   prison.

11          Then there are the special conditions that he must

12   obey the immigration laws and comply with the directives of the

13   immigration authorities; that he provide the probation officer

14   with access to any requested financial information; that he not

15   incur new credit charges or open additional lines of credit

16   without approval of the probation office, unless he is in

17   compliance with the installment payment schedule, which will be

18   10 percent of his gross monthly income beginning the second

19   month of supervised release; next, that he participate in an

20   outpatient mental health treatment program on the standard

21   terms and conditions.

22          Further, that he shall stay at least 100 yards away

23   from the victims in this case, as well as at least 100 yards

24   away from the home, school, business, or place of employment of

25   the victims, and shall refrain from having any communication or

N6N3OCOS

1    other contact, directly or through other persons, by mail,

2    telephone, e-mail, voicemail, social media, or any other means

3    with the victims, and shall refrain from harassing,

4    intimidating, threatening or otherwise interfering with victims

5    or members of the victims' household.

6              Next, that the U.S. probation office in its discretion

7    shall be permitted to install any application or software that

8    allows it to survey and/or monitor all activity of any

9    computers or automated services or connected devices that the

10   defendant uses during the term of supervision, and further

11   aspects of that standard condition will be elaborated in the

12   judgment.

13             Finally, there is a mandatory special assessment of

14   $1,000 that must be paid.

15             Now let's talk about restitution.

16             MR. BROWN:  Your Honor, I appreciate what you said

17   about the practical realities of it.  But I had understood from

18   the government's sentencing submission that they were going to

19   propose an order after the sentencing took place for us to

20   consider --

21             THE COURT:  Okay.  That's certainly permissible under

22   the relevant rules.  So does the government have any problems

23   with that?

24             MS. ZVEROVICH:  Well, your Honor, we were able to

25   submit the order earlier, so we submitted it earlier today.

N6N3OCOS

 1    But we have no objection to allowing the defense to consider
 2    it.
 3                THE COURT:  The amount of restitution will not be part
 4    of the judgment at this time.  But, the parties will inform the
 5    Court within 60 days if they've reached agreement.  And if not,
 6    the Court will then impose restitution as it sees fit.
 7                Before I advise the defendant of his right of appeal,
 8    is there anything else that either counsel wants to raise with
 9    the Court?
10                Anything from the government?
11                MS. ZVEROVICH:  Your Honor, just very briefly.  The
12    first is since we only had one iteration of the PSR in this
13    case, if the Court would just confirm for the record that
14    Mr. O'Connor reviewed the PSR and has no objections to the
15    facts in it.
16                THE COURT:  Yes.  Let me ask Mr. O'Connor's counsel.
17    Is that correct?
18                MR. BROWN:  Yes, your Honor.
19                THE COURT:  Very good.
20                MS. ZVEROVICH:  And then the second matter, your
21    Honor, is the Court previously entered a consent forfeiture
22    order, and I would just like for the Court to place on the
23    record the amount of that.  That was in amount of $794,012.64.
24                THE COURT:  Okay.
25                MS. ZVEROVICH:  And the government also moves to

N6N3OCOS

1    dismiss all open counts.

2            THE COURT:  Yes, that motion is granted.

3            Defense counsel?

4            MR. BROWN:  We noted in a footnote in our submission

5    because he is an alien and doesn't have citizenship, that

6    Mr. O'Connor can't take advantage of the relevant programs that

7    are available to engage in education, any kind of available

8    substance abuse counseling, and those types of programs for

9    sentence reduction purposes.

10           So, when you impose the sentence of 60 months, you may

11   have had in mind the possibility that he would have in whatever

12   facility he's designated to of engaging in the type of

13   rehabilitative programs that might result in a reduced

14   sentence.  He doesn't have that opportunity available to him.

15   I wondered if that would cause you to impose a reduced

16   sentence.

17           THE COURT:  No.  But, that's without prejudice if

18   there are extraordinary circumstances that warrant

19   compassionate release at some future date, you can make an

20   application.  Whether I'll grant it or not, I have no idea at

21   this point.

22           I was struck by your client's sincerity when he made

23   his statement to me.  And if that's true, he shouldn't need any

24   program that will translate into proof of rehabilitation.  Now,

25   that doesn't mean that he should be arbitrarily put at a

N6N3OCOS

1    disadvantage compared to other defendants.  So I think that's

2    really more to be worked out in the future.  If there turns out

3    to be a basis for a motion on that basis or some other at some

4    future time, I'll consider it.  I don't know where I'll come

5    out.

6          But no, my sentence did not include in my mind any

7    reduction for those programs.  But thank you for raising that

8    possibility.

9          MR. BROWN:  Understood, your Honor.  Thank you.

10          THE COURT:  All right.  Now, did defense counsel want

11    the Court to make any recommendation as to place of

12    imprisonment?

13          MR. BROWN:  Not at present, your Honor.  If by Monday

14    we can make a recommendation to you, I know it's not binding,

15    we'll submit a proposal to you.

16          THE COURT:  Okay.  I almost always will accept such a

17    recommendation.  I don't want to say 100 percent of the time,

18    but very, very commonly.  So we'll see what you submit.  If the

19    government has any problem with it, they can raise that at the

20    same time.

21          MS. ZVEROVICH:  Your Honor, if the Court would just

22    set a schedule for defense to get back on the restitution

23    question, just so we have a placeholder to move that process.

24          THE COURT:  What I thought I said was that I wanted

25    the two of you to let me know within 60 days.  And if you can't

N6N3OCOS

1   reach agreement, let me know that and then I will impose my own

2   view of restitution.  But if you reach agreement, that's always

3   to be desired.

4           MS. ZVEROVICH:  Understood, your Honor.  Thank you.

5           THE COURT:  Very good.

6           So, Mr. O'Connor, you have a right to appeal the

7   sentence.  Do you understand that?

8           THE DEFENDANT:  Yes.

9           THE COURT:  If you can't afford counsel for the

10  appeal, the Court will appoint one for you free of charge.  Do

11  you understand that?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Very good.

14          (Adjourned)

15

16

17

18

19

20

21

22

23

24

25